GAIL A. CAHALY & others[1] *vs.* BENISTAR PROPERTY
EXCHANGE TRUST COMPANY, INC., & others.[2]

No. 12-P-956.

Suffolk. December 2, 2013. - June 6, 2014.

Present: KANTROWITZ, GRAHAM, & MEADE, JJ.

*Attorney at Law,* Work product. *Penalty. Practice, Civil,* New trial.

This court vacated the portion of a final judgment in a civil action that involved
a motion by the plaintiffs in that action for sanctions against the law firm
that represented one of the defendants in that action, and remanded the
matter for further proceedings applying correct legal principles, where the
law firm lacked an adequate legal basis, under the guise of the work
product doctrine, for its decisions to withhold information that employees
of its client had viewed certain Web pages of another defendant describing
that defendant's business as an intermediary for third-party funds and then
to present a defense claiming that no employees of the law firm's client
had viewed the very same Web pages [424-428]; further, this court deferred
to the trial court judge on remand the determination whether sanctions
were warranted pursuant to the inherent power of the trial court, on the
ground of a violation of Mass.R.Civ.P. 11, or on the ground of discovery
violations [428-429].
In a civil action, the judge properly denied the defendants' motion for a new
trial. [429-430]

CIVIL ACTIONS commenced in the Superior Court Department
on January 9, 16, 22, and 23, 2001; February 6, 2001; September
20, 2001; and April 30, 2002.

Following review by the Supreme Judicial Court, 451 Mass.

---

[1]Jeffrey M. Johnston; Bellemore Associates, LLC; Massachusetts Lumber
Company, Inc.; Joseph Iantosca, individually and as trustee of Faxon Heights
Apartments Realty Trust and Fern Realty Trust; and Belridge Corporation.

[2]Benistar Ltd.; Benistar Employer Services Trust Corporation; Benistar
Admin. Services, Inc.; Carpenter Financial Group, LLC; Molly Carpenter;
Daniel E. Carpenter (collectively, the Benistar defendants); Merrill Lynch,
Pierce, Fenner & Smith, Inc.; and U.S. Property Exchange; Bingham Mc-
Cutchen LLP, intervener in the sanctions proceedings.

343 (2008), motions for sanctions and for a new trial were heard by *Stephen E. Neel, J.*

*Anthony R. Zelle* for Gail A. Cahaly & others.

*Michael B. Keating* for the intervener.

*Brooks L. Glahn* for Benistar Property Exchange Trust Company, Inc., & others.

MEADE, J. The plaintiffs appeal from the denial of their motion for sanctions against Bingham McCutchen LLP (Bingham), intervener, the law firm that defended Merrill Lynch, Pierce, Fenner & Smith, Inc. (Merrill), in the 2002 jury trial of this action. The plaintiffs claim that in that litigation Bingham wrongfully withheld documents relevant to the issue whether Merrill, in handling the accounts of Benistar Property Exchange Trust Company, Inc. (Benistar), knew that Benistar was trading with money belonging to third parties. We hold that Bingham lacked an adequate legal basis, under the guise of the work product doctrine, for its decisions to withhold information that Merrill employees had viewed certain Benistar Web pages describing its business as an intermediary for third-party funds and then to present a defense claiming that no Merrill employees had viewed the very same Web pages.[3] As a result, we vacate that portion of the final judgment entering judgment in favor of Bingham on the plaintiffs' motion for sanctions.[4] As explained below, there remain certain issues that require resolution by a fact finder, and thus, we remand for further proceedings consistent with this opinion.[5]

*Background.* For background regarding the 2002 trial and the underlying dispute, we refer to *Cahaly* v. *Benistar Property Exch. Trust Co.*, 451 Mass. 343 (2008) (*Cahaly*),[6] in which the Supreme Judicial Court affirmed the order of the Superior Court

[3]Also before us is the Benistar defendants' appeal from the denial of their motion for a new trial.

[4]Final judgment entered on February 7, 2011. Paragraph E pertains to the issue of sanctions.

[5]The plaintiffs prevailed on their claims against Merrill at the new trial. The plaintiffs and Merrill have since settled all claims between them.

[6]The basis of the motion for a new trial in *Cahaly* was certain documents provided by attorney David Patterson. See *Cahaly, supra* at 362-368. The plaintiffs have never contended that Bingham had possession of these documents or wrongly withheld them, and the documents Patterson supplied are not the subject of this appeal.

judge granting the plaintiffs a new trial. The documents at issue here came to light during the preparation of the second trial in 2009, when Merrill, then represented by different counsel, produced the documents as responsive to document requests served by the plaintiffs in 2001. As a result, after the second trial, the plaintiffs moved for sanctions against Merrill and Bingham, intervener on the issue of sanctions, and the judge conducted an eight-day evidentiary hearing on the motion. He adopted most of the 334 stipulated facts submitted by the parties and made comprehensive additional findings of fact, set out in his January 11, 2011, memorandum and order. We summarize those facts here, adding additional materials from the record where noted.

Merrill retained Bingham in June, 2001, to represent it in connection with the complaints filed by the plaintiffs, who were former clients of Benistar and who claimed losses of $8 million as a result of Benistar's wrongdoing in investing the plaintiffs' funds. John R. Snyder, a Bingham partner and experienced trial attorney, became Merrill's lead trial counsel, and proceeded to gather information in response to discovery requests. In speaking with Merrill employees involved with the Benistar accounts, Snyder was informed that none of them knew that the money in those accounts belonged to third parties, and that on September 20, 2000, Benistar's trading was restricted because of losses rather than because of concerns that the accounts contained third-party funds. Snyder also determined that none of Merrill's employees had visited the § 1031 pages of the Benistar Web site,[7] which explained that Benistar's business was to serve as an intermediary for third-party funds.

On July 15, 2002, Snyder received a file from Joseph Pash, a Merrill in-house lawyer, which Pash had obtained from Martin Malia, an options specialist in Merrill's compliance department. The file contained documents indicating that on the morning of September 20, 2000, the day Merrill ordered Benistar's trading restricted, Malia had visited the § 1031 pages of the Benistar Web site. Those pages contained information about § 1031

---

[7] Section 1031 refers to a section of the Internal Revenue Code, 26 U.S.C. § 1031 (2006), that permits tax advantages for certain like-kind property exchanges and requires that the proceeds be placed in an escrow account, a qualified trust, or with a qualified intermediary. See Cahaly, supra at 345 n.4.

property exchanges and revealed that Benistar's business was as an intermediary to hold funds for clients engaged in § 1031 property exchanges. The pages contained a question and answer section, including the following:

> "Can I trust Benistar Property Exchange with My Money? . . . [W]e protect your assets: We have accounts with major banking and investment firms — accounts under our sole control, as required for these exchanges. . . . Our accounts are restricted to paying out funds only for a subsequent closing, or to return funds to the original property owner. We distribute funds only at your written request."

The judge found that the § 1031 pages of the Benistar Web site disclosed that Benistar handled other people's money and caused Malia to suspect that Benistar was trading other people's money through its Merrill accounts. The judge also found that this information concerned Malia because of the losses in Merrill's Benistar accounts, but that the Web site did not inform Malia that Benistar's options trading was a breach of Benistar's duty to its clients to hold their funds in low-risk escrow accounts. Also in the file was a facsimile transmission (fax) from Malia to Thomas Rasmussen, a Merrill administrative manager, sent at 11:04 A.M. on September 20, 2000, attaching the § 1031 Web site pages.[8]

Upon reviewing the Malia file, Snyder thought that some of the documents might be protected under the work product doctrine. When he spoke with Malia, Malia indicated that he performed the Web site search before he made the decision to restrict the accounts and that the information on the question and answer page gave him some suspicion of embezzlement.

---

[8]The Malia file also included, among other things, a September 27, 2000, electronic mail message from Hassan Tabbath, a Merrill vice-president, requesting that brokers involved with the Benistar account send a letter, "Confidential to Counsel," concerning their "knowledge about the client managing other people's money." The file also contained the brokers' October 2, 2000, "Confidential to Counsel" memorandum, stating that "[a]s far as we know [Carpenter's] major source of business is: estate planning, insurance, pension management and real estate transactions. We have been under the assumption that the money he has been investing has been his own." (Carpenter refers to Daniel E. Carpenter, Benistar's chairman and sole shareholder.)

Malia also told Snyder that in September, 2000, he reported to Dennis Pape, an attorney working as a compliance supervisor at Merrill, and after September 22, 2000, he was working with an in-house lawyer of Merrill's office of general counsel.[9]

Snyder discussed with Merrill's in-house lawyers whether the Malia file was protected from disclosure under the work product doctrine. They considered that Malia operated under the umbrella of the office of general counsel, that he acted on occasion when litigation was anticipated, and that he was generally under the direction of attorneys. Pash determined that the documents were protected work product, and Snyder agreed.[10] We add that Snyder testified at the evidentiary hearing that he did not know whether he conducted legal research in making the work product determination, but he did not think that Bingham's billing records would reflect such research.

On June 19, 2002, the trial judge granted the plaintiffs' emergency motion to compel evidence of visits by Merrill employees to the Benistar Web site. Merrill responded that no nonprivileged documents had been found. In October, 2002, after receiving the Malia file, Bingham drafted supplements to several of Merrill's interrogatory answers concerning Merrill's knowledge of Benistar's business and visits to the Web site. Those responses would have disclosed the fact that Malia had viewed the § 1031 pages. In the end, Snyder decided not to serve the supplemental answers, following his determination that the Malia file was protected work product.

We also add from the record that prior to receiving the Malia file, Bingham had filed a motion for summary judgment, which contained the following representation: "At no time prior to the transfer of the accounts did any employee at Merrill Lynch learn that the funds in the Benistar accounts were being held by

---

[9]September 22, 2000, is the date on which Daniel Carpenter wrote to Merrill protesting the trading restrictions placed on the Benistar accounts and stating, among other things: "We have chosen Merrill [Lynch] as our depository for our clients so we cannot move the funds elsewhere." Benistar moved its funds to an account at UBS Paine Webber, Inc., in October, 2000.

[10]Snyder also considered whether to call Malia as a witness, as his testimony might have been useful to rebut certain arguments made by Benistar against Merrill. It was determined that Merrill would waive its work product protection for the Malia file by so doing, and the decision was made not to call him.

Benistar as a third party intermediary for real estate transactions or that those funds were Benistar client escrowed funds." In addition, the parties stipulated that Merrill's portion of the first revised joint pretrial memorandum, dated September 25, 2002, included the following: "At no time prior to the transfer of the Benistar accounts from Merrill Lynch to Paine Webber did any employee at Merrill Lynch learn that the funds in the accounts were being held by Benistar as a third party intermediary for real estate transactions or that those funds were Benistar client escrow funds."

At the hearing on the motion for sanctions, the parties stipulated that at the 2002 trial, Snyder, in examining Rasmussen, asked whether Rasmussen knew in 2000 that Benistar acted as a third-party intermediary or escrow agent handling other people's money, and Rasmussen testified that he did not. Rasmussen also testified that he never visited the Benistar Web site before the accounts were transferred to UBS Paine Webber, Inc., and that he had never thought to do so. The record further discloses that Snyder told the jury, in closing, that "the Merrill people" did not know that the funds in the accounts belonged to third parties, and that the witnesses all said they did not know what a § 1031 exchange was and that there was no reason for them to go to the § 1031 "button" on the Web site. According to the record, in Merrill's motion for judgment notwithstanding the verdict, Merrill argued that the plaintiffs "have failed even to present sufficient evidence to support a reasonable inference that Merrill knew that the Benistar accounts contained third party funds."

Following the sanctions hearing, the judge concluded that Snyder acted in good faith in failing to disclose the Malia file and in presenting a defense at the 2002 trial that included the claim that Merrill employees had not viewed the § 1031 pages of the Benistar Web site.

*Discussion.* The plaintiffs maintain that Snyder was prohibited from not disclosing the fact, under the work product doctrine, that certain Merrill employees had seen the § 1031 pages of the Benistar Web site, and then asserting, as part of Merrill's defense, that Merrill employees had not seen the § 1031 pages of the Benistar Web site. We agree.

We review the judge's decision regarding sanctions for abuse of discretion. "[O]ur function is to determine whether the judge abused that discretion, which includes considering whether proper legal standards were applied and whether there was reasonable support for the judge's evaluation of the facts." *Psy-Ed Corp.* v. *Klein*, 62 Mass. App. Ct. 110, 114 (2004), quoting from *Van Christo Advertising, Inc.* v. *M/A-COM/LCS*, 426 Mass. 410, 417 (1998). In so doing, we accept the judge's findings of fact as true unless they are clearly erroneous. "On the other hand, to ensure that the ultimate findings and conclusions are consistent with the law, we scrutinize without deference the legal standard which the judge applied to the facts." *Kendall* v. *Selvaggio*, 413 Mass. 619, 621 (1992). See *Panagakos* v. *Collins*, 80 Mass. App. Ct. 697, 702 (2011) (clearly erroneous standard does not protect findings based on incorrect legal standard).

1. *The work product doctrine.* The Massachusetts work product doctrine derives from *Hickman* v. *Taylor*, 329 U.S. 495 (1947), and may be invoked to protect from discovery certain types of documents prepared by a party's attorney, or nonlawyer representative, in anticipation of litigation. "The work product doctrine is codified in Mass.R.Civ.P. 26(b)(3), [365 Mass. 772 (1974)]. . . ." *McCarthy* v. *Slade Assocs.*, 463 Mass. 181, 194 (2012). The doctrine is intended "to prevent one party from piggybacking on the adversary's preparation," *Commissioner of Rev.* v. *Comcast Corp.*, 453 Mass. 293, 312 (2009) (*Comcast Corp.*), quoting from *United States* v. *Adlman*, 68 F.3d 1495, 1501 (2d Cir. 1995), and thus protects from disclosure the attorney's "mental impressions, conclusions, opinions, or legal theories" regarding the litigation. Mass.R.Civ.P. 26(b)(3).

The judge correctly cited the legal principle from *Comcast Corp.*, i.e., that the work product doctrine may be invoked to protect documents that a party's nonlawyer representative prepared, or obtained, in anticipation of litigation. Much of the judge's analysis focused on whether Snyder reasonably believed that Malia's investigation of the Benistar account in September, 2000, was undertaken in his role as Merrill's legal representative and in anticipation of litigation, and the judge credited both

Snyder and Bingham's expert in concluding that Snyder's decision to withhold the documents on those grounds had an adequate basis in the law and was made in good faith.

However, in *Comcast Corp.*, the Supreme Judicial Court went further and identified two important qualifications to the work product doctrine that bear directly on the facts of this case and were absent from the judge's analysis. First, the court noted that work product may be subject to disclosure upon a showing of a substantial need for the material and that its equivalent cannot be obtained by other means. *Comcast Corp., supra* at 314. See *Chambers* v. *Gold Metal Bakery, Inc.*, 464 Mass. 383, 391 n.22 (2013). Substantial need is shown where, as here, the work product at issue is central to the parties' substantive claims. See *McCarthy* v. *Slade Assocs., supra* at 195, citing *Madanes* v. *Madanes*, 199 F.R.D. 135, 150 (S.D.N.Y 2001). In fact, the plaintiffs specifically sought, and the trial judge ordered, that Merrill produce evidence of Web site visits.

The second qualification noted by the court is that the doctrine encompasses two types of work product, fact and opinion. *Comcast Corp., supra.* The court distinguished the degree of protection afforded each type, explaining that the rule affords protection primarily against disclosure of an attorney's opinion, that is, "the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." *Ibid.*, quoting from Mass.R.Civ.P. 26(b)(3). Fact work product, on the other hand, receives far less protection. *Comcast Corp., supra.* It has long been held that "[w]here relevant and non-privileged facts remain hidden in an attorney's file and where production of those facts is essential to the preparation of one's case, discovery may properly be had." *Hickman* v. *Taylor*, 329 U.S. at 511. See *Fleet Natl. Bank* v. *The Gloucester Corp.*, 150 F.R.D. 10, 14 n.6 (D. Mass. 1993) (litigants cannot use work product doctrine to shield relevant facts from discovery). See also *Resolution Trust Corp.* v. *Dabney*, 73 F.3d 262, 266 (10th Cir. 1995) (doctrine principally guards against disclosing attorney's strategies and legal impressions, and does not protect "facts concerning the creation of work product or facts contained within work product"); *Koch Materials Co.* v. *Shore Slurry Seal, Inc.*, 208 F.R.D. 109, 122 (D.N.J. 2002).

With these qualifications in mind, we conclude that Snyder lacked an adequate basis in law to support his decision to withhold, as protected work product, the significant facts that Malia visited the § 1031 pages on the Benistar Web site on September 20, 2000, and then sent those pages by fax to Rasmussen. "Simply identifying what documents an attorney reviewed, what documents were provided by a consultant, or what documents were provided to the client, in each instance without any requirement to describe content, reveals nothing about the attorney's (or the consultant's or the client's) opinion or impression of any of the documents, or any conclusions the attorney (or consultant or client) drew from them." *McCarthy* v. *Slade Assocs.*, 463 Mass. at 201, citing *Bamberg* v. *KPMG LLP*, 219 F.R.D. 33, 36 (D. Mass. 2003). See *In re San Juan Dupont Plaza Hotel Fire Litigation*, 859 F.2d 1007, 1014-1018 (1st Cir. 1988). Snyder's failure to supplement the interrogatories seeking that factual information, and his continued assertion, in pleadings and at trial, that Merrill employees had not visited the § 1031 Web site, were without legal justification.

Even assuming, without deciding, that Snyder was reasonable in his belief that Malia's visit to the § 1031 Web site pages, and Malia's fax to Rasmussen containing those pages, revealed Malia's mental impressions, we discern no adequate basis in the law for Snyder's belief that he could withhold the information and still assert a defense claiming just the opposite.

Plainly, whether Merrill employees had visited the Benistar Web site, and what knowledge they gleaned therefrom, were significant points of contention in the parties' dispute. In *Ward* v. *Peabody*, 380 Mass. 805, 817-818 (1980), the court explained that protection for work product does not extend to evidence of the "words and deeds" of an attorney when the inquiry bears on an issue in dispute, in that case the activities of a contractor and its law firm alleged to have improperly influenced the award of public contracts. "[W]hen the activities of counsel are inquired into because they are at issue in the action before the Court, there is cause for production of documents that deal with such activities, though they are 'work product.' 4 Moore's, Federal Practice par. 26.62[4] at 26-447 (2d ed. 1979)." *Id.* at

818.[11] More recently, in *McCarthy* v. *Slade Assocs.*, 463 Mass. at 195, the Supreme Judicial Court reiterated that work product was not shielded from discovery if the parties' dispute "puts in play" the knowledge of the plaintiff and her attorney, in that case knowledge of the location of a parcel of land, which was pertinent to the discovery rule asserted by the plaintiffs in response to a statute of limitations defense.

The fact that a Merrill employee, lawyer or nonlawyer, knew that Benistar's business was as an intermediary for third-party funds was significant to the plaintiffs in making out their claim for aiding and abetting against Merrill. Moreover, the evidence of Malia's visit to the § 1031 pages of the Benistar Web site on September 20, 2000, and his transmission of those pages by fax to Rasmussen, ran directly counter to the heart of Merrill's defense that it had no such knowledge. Indeed, the plaintiffs' failure to provide such evidence was repeatedly highlighted by Merrill as a fatal flaw in the plaintiffs' case throughout the 2002-2003 proceedings. Its disclosure would have revealed facts that would have contradicted the observations of the trial judge,[12] this court,[13] and the Supreme Judicial Court,[14] in their

---

[11]See *Kearney & Trecker Corp.* v. *Giddings & Lewis, Inc.*, 296 F. Supp. 979, 982 (E.D. Wis. 1969) (cited in *Ward* v. *Peabody, supra*) (production of work product documents required where claim of unclean hands in patent procurement called into question relationship between plaintiff and its patent consultant, a former patent office employee). See also *Gulf Constr. Co.* v. *St. Joe Paper Co.*, 24 F.R.D. 411, 414-415 (S.D. Tex. 1959) (best evidence of mitigation involved communications between attorneys); *Bourget* v. *Government Employees Ins. Co.*, 48 F.R.D. 29, 33 (D. Conn. 1969) (insurer's attorney's knowledge as to severity of plaintiff's injuries subject to disclosure in failure to settle case).

[12]In ruling on Merrill's motion for judgment notwithstanding the verdict in the 2002 trial, the trial judge observed that while certain Merrill employees looked at the Benistar Web site homepage and one employee looked at information about "§ 419" employee benefit plans under the Internal Revenue Code, "[i]t is the case that the Benistar.com website contains information about Benistar Property Exchange Trust Company and its role as a 'qualified intermediary' for purposes of property exchanges under § 1031 of the Internal Revenue Code, but this appears in a separate, discrete part of the website that is not visible on the home page or in connection with any information about § 419 plan administration."

[13]"The judge found scant evidence that Merrill Lynch had actual knowledge that Benistar was using funds belonging to third parties . . . ." *Cahaly* v. *Benistar Property Exch. Trust Co.*, 68 Mass. App. Ct. 668, 671 (2007).

[14]"Testimony from several Merrill Lynch employees that they viewed the

respective rulings, that evidence of Merrill's knowledge of the nature of Benistar's business was lacking in the 2002 trial. See Mass. R. Prof. C. 3.3(a)(1), 426 Mass. 1383 (1998) (lawyer shall not knowingly make false statement of material fact or law to tribunal). It likely would have led the plaintiffs to the existence of other relevant facts and would have been useful in cross-examining the Merrill witnesses, Rasmussen in particular, who denied ever seeing the information. See *Hickman* v. *Taylor*, 329 U.S. at 511. See also Mass. R. Prof. C. 3.3(a)(4), 426 Mass. 1383 (1998) (lawyer shall not knowingly offer evidence that lawyer knows to be false).

These important qualifications to the work product doctrine, which relate directly to the undisputed facts of this case, were not addressed in the judge's rulings when he relied on *Comcast Corp.* to conclude that Snyder had an adequate basis in law to support his work product determination. We are also of the view that Snyder's persistence in pursuing a defense that included Merrill's lack of knowledge of the nature of Benistar's business and the § 1031 Web site pages calls into question his good faith. Accordingly, the judge's ultimate finding that Snyder acted reasonably and in good faith in withholding critical documents as work product must be reassessed in light of the legal principles we have set out here. Nevertheless, reasonableness and good faith are determinations we leave to the fact finder, who is in a better position to assess the credibility of witnesses and to weigh the evidence, in the context of the applicable law. See *Cahaly, supra* at 369. See, e.g., *Psy-Ed Corp.* v. *Klein*, 62 Mass. App. Ct. at 114. For that reason, the matter is remanded for further proceedings consistent with this opinion.

2. *Authority for imposition of sanctions.* The plaintiffs no longer press the ground of fraud on the court as a basis for

Benistar Web site homepage (which did not contain a description of Benistar Trust's business) and a linked page that had nothing to do with § 1031 like-kind exchanges has no probative value in establishing Merrill Lynch's knowledge of the primary wrongdoing." *Cahaly, supra* at 356. The court also observed: "Several witnesses for Merrill Lynch testified that not only did they not know the actual nature of Benistar Trust's business as a 'qualified intermediary' under § 1031, but they also had no understanding of § 1031 or its requirements until the first of the plaintiffs' lawsuits was filed in January, 2001." *Id.* at 354 n.24.

imposing sanctions. But the plaintiffs maintain that Bingham's conduct was sufficiently egregious to warrant sanctions pursuant to the inherent power of the trial court. See generally *Sommer* v. *Maharaj*, 451 Mass. 615, 621-622 (2008); *Munshani* v. *Signal Lake Venture Fund II, LP*, 60 Mass. App. Ct. 714, 719 n.6 (2004) (court's inherent power to impose sanctions for attorney misconduct was not limited to instances of fraud on the court).

The plaintiffs additionally rely on Mass.R.Civ.P. 11, 365 Mass. 753 (1974), requiring that pleadings be based on an attorney's reasonable inquiry and an absence of bad faith. See *Doe* v. *Nutter, McClennen & Fish*, 41 Mass. App. Ct. 137, 142 (1996). The rule requires "at least some level of reasonable inquiry" into the factual and legal basis supporting the pleading. *Psy-Ed Corp.* v. *Klein*, 62 Mass. App. Ct. at 113. See *Van Christo Advertising, Inc.* v. *M/A-COM/LCS*, 426 Mass. at 416-417 (we do not condone "an attorney's 'wilful ignorance' of facts and law which would have been known had the attorney simply not consciously disregarded them"). In ruling on a motion for rule 11 sanctions, a judge may consider whether the attorney's misconduct was the result of a "genuine, professional judgment," see *Psy-Ed Corp.* v. *Klein*, *supra* at 117, or was instead to secure a tactical advantage by hampering the opposing party's presentation of its case, in violation of the rules of court and of professional conduct. *Munshani* v. *Signal Lake Venture Fund II, PL*, *supra* at 720.

Finally, the plaintiffs urge that sanctions be imposed against Bingham for discovery violations, for its failure to supplement the plaintiffs' interrogatories in 2002. See, e.g., *Keene* v. *Brigham & Women's Hosp., Inc.*, 56 Mass. App. Ct. 10, 21 (2002), *S.C.* 439 Mass. 223, 235 (2003); *Short* v. *Marinas USA Ltd. Partnership*, 78 Mass. App. Ct. 848, 853 & n.7 (2011). We defer to the judge on remand to determine whether sanctions are warranted on any of those grounds, as determined by the judge's further findings on Bingham's good faith and the nature and effect of the violations.[15]

3. *Benistar defendants' appeal.* The Benistar defendants ap-

---

[15]We reject Bingham's suggestion that it produced enough information to the plaintiffs prior to the 2002 trial to alert them to Malia's role — that the fault somehow belonged to the plaintiffs. As the court observed in *Cahaly,*

peal from the judge's denial of their motion for a new trial. The judge relied principally on *Cahaly*, *supra* at 362-368, wherein the court denied Benistar's motion for a new trial based on the newly discovered evidence addressed in that case. We agree with the judge that the Benistar defendants have not demonstrated that the documents produced by Merrill in 2009 require a different outcome.

*Conclusion.* The order denying the Benistar defendants' motion for a new trial is affirmed. Paragraph E of the final judgment entered on February 7, 2011, is vacated as to intervener Bingham only, and the matter is remanded to the Superior Court for further proceedings consistent with this opinion.[16]

*So ordered.*

---

*supra* at 367, "the plaintiffs' repeated efforts at increasingly tailored discovery were impeded at nearly every turn by Merrill Lynch."

[16]Because the judge who decided the plaintiffs' motion for sanctions has retired, the judge deciding the motion on remand may, in his or her discretion, hear additional evidence and receive additional submissions from the parties.